No. 9136.

FISHER v. THE STATE.

CRIMINAL LAW.—*Murder.*—*Evidence.*—In a criminal prosecution for murder, where the deceased was slain by the defendant with a brick, it is not error to allow the State to prove that a third person, immediately before the homicide, directed the defendant to take a brick and search for the deceased, if the defendant's conduct tended to show that he acted upon the suggestion.

SAME.—*Instruction.*—*Witness.*—It is not error to instruct the jury, that they may consider the "integrity or dishonesty of witnesses" in determining their credibility. This may be done without any other proof than such as the appearance, deportment and testimony of the witnesses themselves furnish.

SAME.—*Manslaughter.*—*Practice.*—*Case Distinguished.*—In such action, it was not error to instruct the jury that the defendant might be convicted either of "murder in the second degree or of voluntary manslaughter," where it does not appear that he was not convicted of involuntary manslaughter. *Hoss* v. *The State*, 18 Ind. 349, distinguished.

SAME.—In such case, the instruction was correct as far as it went, and, if the defendant desired it extended, he should have requested it.

From the Gibson Circuit Court.

*R. M. J. Miller*, for appellant.

*D. P. Baldwin*, Attorney General, *W. H. Trippet*, Prosecuting Attorney, *W. W. Thornton* and *M. W. Fields*, for the State.

BEST, C.—The appellant was indicted for murder in the second degree, was tried, convicted of manslaughter, and sentenced to imprisonment in the State's prison for fourteen years. His motion for a new trial was overruled, and this ruling is assigned as error. The reasons embraced in the motion, and relied upon for a reversal of the judgment, are the following, viz. :

1st. The court erred in allowing Moses Witherspoon to testify to certain "words spoken by Charles Givens to the defendant," and by its refusal afterward to strike them out.

2d. By giving, of its own motion, the fifth and seventh instructions.

These causes for a new trial will be considered in the order of their statement. To apprehend the relevancy of the first, a condensed statement of the facts is necessary. It appears that the deceased and the appellant, who were cousins, had had some difficulty during the afternoon of March 14th, 1880, at Patoka, Gibson county, Indiana, where the homicide occurred, and, about dusk of said day, the deceased and several other persons were standing at the rear end of Lamb's store, in said town, near a well to which the people were accustomed to go, through an alley, for water. At this time appellant and one Charles Givens were in front of Fisher's store, about seventy-five yards distant from deceased, talking, and appellant said to Givens that deceased had cut him with a knife, and had torn his shirt collar; whereupon Givens said to him,"take this brick and go down street and see if you can find him, and don't be bluffed off by him." Immediately both started in the direction of the deceased; went together as far as Lamb's store; appellant then passed through the alley to the rear of the store, and struck the deceased with a brick upon the head with such force as to cause his death within a day or two thereafter. The deceased was at the time partially intoxicated, and there is some conflict in the testimony as to whether or not he

staggered toward appellant when the latter approached him, and whether or not he had a knife in his hand at the time.

The statement of Givens was offered by the State, with the accompanying circumstances, to show the purpose of the appellant in striking the fatal blow.

The appellant concedes that this testimony was properly admitted, if the evidence had shown that the appellant had "accepted the brick, assented to the proposition, or had acted upon it."

Jerould's store adjoined Fisher's store, and before this testimony was admitted, Allen Wheeler had testified: "I saw Thomas Fisher and Charles Givens standing close to Jerould's store. They were standing there as I came along. * * * * Thomas had a whole brick in his hand; Thomas went down street with brick in his hand. * *. * * It is 50, 60 or 75 yards from Jerould's store to Lamb's store. * * * I followed Tom Fisher through the alley; he had a brick in his hand. * * * Charles Givens went around first and Tom ran by me, when I was near far end of Stewart's store; he went up to where Byron Fisher was and struck him with the brick."

Jesse Johnson testified: "I saw Tom (meaning appellant) in front of Fisher's store talking with some one. * * * I next saw him in front of Lamb's store; I was there when he came down; when I saw him he had a brick in his hand."

Henry Chambers testified: "I saw Tom (meaning appellant) come from behind Jerould's store in front of Fisher's store, and was talking; I went down to Lamb's store, about seventy-five yards from where I first saw him; I stopped at Lamb's store; I saw Tom come down and walk across the alley to me; he had something that looked like a brick in his hand."

Jesse Alvis testified: "I first saw Tom Fisher that evening about dusk. * * * * Tom went up to Fisher's store

Fisher *v.* The State.

and picked up a brick; Charley Givens was with him; he started off down street with it.''

Robert Dixon testified: ''I was in front of Lamb's store; * * * I saw Tom (meaning appellant) come down the street; he had a brick in his hand; he said Byron Fisher had drawn a knife on him. * * * He went back in the alley; he came out in a few minutes; he said he had hit him, and he was ready to go the penitentiary for it.''

This testimony tends very strongly to show that appellant acted upon Givens' suggestion. It shows that he either accepted a brick from Givens, or picked up the one indicated by him, started at once in search of the deceased, found him and slew him with a brick. In all this there must have been some purpose. Givens' statement clearly indicated it, and we think that appellant's conduct was as complete an adoption of the suggestion, as though he had said ''I will.'' By his acts the direction of Givens became his declaration, and was simply an audible expression of what his conduct implied. Indeed, the inference arising from his acts is the same as the one implied by the statement, and we do not think the statement makes it stronger, but the prompt adoption of it is such as to make it appellant's own, and therefore the court did not err in admitting proof of it in connection with the appellant's acts accompanying it.

Appellant complains of a portion of the fifth instruction. The court, after saying that the jury must determine the weight of the evidence, said: ''You had the opportunity to look into the face of the witnesses, and to observe their countenance and demeanor while on the witness stand. It is your province to take into account the conduct and demeanor of the witnesses while so testifying. Their opportunity to know the matters about which they testify, their intelligence, their memory, their integrity or dishonesty, their indifference or bias in relation to the case, are all elements to be considered in weighing their testimony.''

The objection to this instruction is, that the court told the jury that the "integrity or disbonesty" of witnesses might be considered in determining the weight of their testimony. The appellant says that no proof can be offered of a witness' dishonesty, and the jury have no right to consider what can not be proved. This is not strictly true. No proof, in the ordinary acceptation of the term, can be made of the appearance, demeanor, intelligence, memory and capacity of the witnesses. Yet all these things may be considered by the jury, in weighing their testimony. Many things may be considered by the jury for such purpose, without proof of contradictory statements, or proof that the witness' general reputation for truth, or his general character for morality, is bad. If a witness is fair, candid, disinterested and apparently sincere, these indicate integrity; if, on the other hand, he is unfair, biased, prejudiced, and he prevaricates in his testimony, these indicate dishonesty, and all may be considered in determining his credibility. In *McLees* v. *Felt*, 11 Ind. 218, it was said : "The weight that should be attached to the testimony of a witness, depends upon his honesty of purpose, his capacity to understand the subject-matter, and his means of knowing the facts about which he is testifying, as well as his disinterestedness and freedom from bias and prejudice.   *   *   *   These are matters which a jury may well take into consideration, and give to the testimony of a witness such weight and credibility as they may think it entitled to under all the circumstances, and no more."

These matters may be considered by the jury without proof, other than such as the appearance, deportment and testimony of the witness himself furnish. There was no error in giving this instruction.

The indictment was in the usual form for murder in the second degree. In the seventh instruction, the court told the jury that the appellant might "either be convicted of

murder in the second degree, or of voluntary manslaughter," but did not say that he might be convicted of involuntary manslaughter, and this, the appellant insists, was error. In support of this position the case of *Hoss* v. *The State*, 18 Ind. 349, is cited. In that case the court erroneously instructed the jury that fourteen years' imprisonment was the greatest punishment that could be inflicted for manslaughter. The jury found the defendant guilty of murder in the second degree, and fixed his punishment at imprisonment for life. This court reversed the case, holding that the instruction probably prejudiced the defendant, saying that if the jury had been informed that twenty-one years' imprisonment for manslaughter could be assessed, they might have deemed that punishment sufficient; but, as they were informed that fourteen years was the limit, they may have been induced, because they deemed the punishment insufficient, to find the defendant guilty of the higher crime, and thus have assessed a greater punishment than they otherwise would have done.

The questions are not analogous. The punishment for voluntary and involuntary manslaughter is the same, and therefore the reason that operated prejudicially in *Hoss* v. *The State*, *supra*, could not in this case. Nor can this case be made analogous, by assuming that the appellant, under the charge, was convicted of voluntary manslaughter and a corresponding punishment assessed, and that, if the jury had been informed that he could have been convicted of involuntary manslaughter, he would probably have been convicted of such offence and a lighter punishment assessed, for the reason that there is nothing about the punishment assessed, or the verdict returned, to indicate that he was not convicted of and punished for the latter offence.

The verdict of the jury was: "We, the jury, find the defendant guilty of manslaughter as charged in the indictment, and assess his punishment that he be imprisoned in the State's prison for the period of fourteen years." For aught

that appears from this verdict, the appellant was convicted of involuntary manslaughter, and if so he was not injured by the omission of the court to instruct the jury that he might be convicted of such offence.

Again, the instruction as given was correct; and if the appellant desired such an instruction as he insists the court should have given, it was his duty to request it. In the absence of such request and a refusal by the court to instruct as requested, there was no error in the mere omission to thus instruct. *Rollins* v. *The State*, 62 Ind. 46.

There is no error in the record, and the judgment should be affirmed.

PER CURIAM.—It is therefore considered, upon the foregoing opinion, that the judgment be, and it is in all things, hereby affirmed, at appellant's costs.